1  BRADFORD J. DEJARDIN (Bar No. 195764)
   brad.dejardin@dentons.com
2  SYLVIA CHIU (Bar No. 269844)
   sylvia.chiu@dentons.com
3  DENTONS US LLP
   601 South Figueroa Street, Suite 2500
4  Los Angeles, California 90017-5704
   Telephone:  (213) 623-9300
5  Facsimile:   (213) 623-9924

6  Attorneys for Defendant
   **METALCLAD INSULATION LLC**

7

8              **UNITED STATES DISTRICT COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA**

10

11  BRIAN HOUGHTON,                          CASE NO.

12          Plaintiff,                        **NOTICE OF REMOVAL TO**
                                              **FEDERAL COURT PURSUANT**
        v.                                    **TO 28 U.S.C. § 1442(a)(1)**
13                                            **(FEDERAL OFFICER) AND 28**
    ABB, INC. d/b/a ABB DE INC. (sued        **U.S.C. § 1441(a) (FEDERAL**
14  individually and as successor-in-interest to  **ENCLAVE)**
    (ITE IMPERIAL CO f/k/a ITE CIRCUIT
15  BREAKER COMPANY); DUREZ              Complaint Filed: March 8, 2018
    CORPORATION; FORD MOTOR             Date Removed:    April 13, 2018
16  COMPANY; FOSTER WHEELER             Trial Date:       None Set
    ENERGY CORPORATION; GENERAL
17  ELECTRIC COMPANY; GOULD
    ELECTRONICS, INC. (sued as
18  successor-in-interest to ITT CIRCUIT
    BREAKER COMPANY); HENNESSY
19  INDUSTRIES, INC.; HONEYWELL
    INTERNATIONAL, INC. f/k/a ALLIED-
20  SIGNAL, INC. (sued as successor-in-
    interest to BENDIX CORPORATION);
21  HOPEMAN BROTHERS INC.; J.T.
    THORPE & SON, INC.; M. SLAYEN
22  AND ASSOCIATES, INC.;
    METALCLAD INSULATION LLC
23  formerly d/b/a METALCLAD
    INSULATION CORPORATION;
24  OCCIDENTAL CHEMICAL
    CORPORATION f/k/a HOOKERS
25  CHEMICAL CO. (sued as successor-in-
    interest to DUREZ CORPORATION);
26  ROCKWELL AUTOMATION, INC.
    f/k/a ROCKWELL INTERNATIONAL
27  CORPORATION (sued individually and
    as successor-in-interest to ALLEN
28  BRADLEY CO.); SCHNEIDER

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 1 -

107104096\V-1

1  ELECTRIC USA, INC. f/k/a SQUARE D
   COMPANY; SIEMENS
2  CORPORATION (sued as successor-in-
   interest to ITE CIRCUIT BREAKER
3  COMPANY); SYD CARPENTER,
   MARINE CONTRACTOR, INC.;
4  UNION CARBIDE CORPORATION;
   and DOES 1-450 INCLUSIVE,
5
6                    Defendants.

7  TO THE HONORABLE COURT, ALL PARTIES AND THEIR ATTORNEYS OF

8  RECORD:

9          Defendant METALCLAD INSULATION LLC (hereinafter "Metalclad")

10 hereby gives notice of the removal of the above-entitled action from the Superior

11 Court of the State of California, County of Los Angeles, to the United States District

12 Court for the Central District of California, Western Division, pursuant to 28 U.S.C.

13 § 1442(a)(1), 28 U.S.C. §§ 1331, 1441(a), and 1446.  In support of its removal,

14 Metalclad respectfully offers the following.

15                                    **I.**

16           **JURISDICTIONAL GROUNDS FOR REMOVAL**

17     1.     Removal of this case is proper pursuant to 28 U.S.C. §1442(a)(1) as

18 this is a civil action commenced in a state court against the United States or agency

19 thereof or any officer (or any person acting under that officer) of the United States

20 or any agency thereof, sued in an official or individual capacity for any act under

21 color of such office.

22     2.     Original federal jurisdiction is not required for removal pursuant to 28

23 U.S.C. § 1442(a)(1).  *See Willingham v. Morgan,* 395 U.S. 402, 406 (1969) ("the

24 right of removal under § 1442(a)(1) is made absolute whenever a suit in state court

25 is for any act "under color" of federal officer, regardless of whether the suit could

26 originally have been brought in federal court."); *Jefferson County v. Acker,* 527 U.S.

27 423 (1999) (under the federal officer removal statute, suits against federal officers

28 may be removed despite the nonfederal cast of the complaint).

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 2 -

NOTICE OF REMOVAL PURSUANT TO
28 U.S.C. §§1441(a) & 1442(a)(1)

3.      Removal of this case is also proper pursuant to 28 U.S.C. § 1441(a) under federal enclave jurisdiction.

## II.

## __PRELIMINARY MATTERS__

4.      On March 8, 2018, Plaintiff filed his Complaint for Personal Injury (Asbestos) ("Complaint") in *Brian Houghton v. ABB, Inc., et al.*, Case No. BC 697306 (Superior Court, Los Angeles County, California).

5.      A substantial number of defendants named in the Complaint are alleged to have regularly conducted business in the County of Los Angeles.

6.      Pursuant to Civil Local Rule 3-2(d), all civil actions arising in Los Angeles County shall be assigned to the Central District of California, Western Division.  Venue is proper in the Central District of California, Western Division because the underlying state court action was filed in the Superior Court of California for the County of Los Angeles and all parties are subject to personal jurisdiction in this District.

7.      On March 14, 2018, Plaintiff served Metalclad with the Summons and Complaint.  In his Complaint, Plaintiff seeks damages for personal injuries (mesothelioma) due to his alleged exposure to asbestos while working as an electrician's mate and duty electrician for the U.S. Navy from approximately 1964 to 1968 at Mare Island Naval Shipyard in Vallejo, California and Long Beach Naval Shipyard in Long Beach, California and while he was in the U.S. Navy reserves from 1973 to 1988 in Long Beach, California.  *See* Summons and Complaint and Preliminary Fact Sheet attached as **Exhibit A** to the Declaration of Sylvia Chiu ("Chiu Decl."), which reflects a true and correct copy of all process, pleadings, and orders in the State Court Action that have been served upon Metalclad, as required by 28 U.S.C. § 1446(a).

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

107104096\V-1

8.     Metalclad is filing this Notice of Removal within thirty (30) days of the service of Plaintiff's Complaint in this action, and thus removal is timely under 28 U.S.C. § 1446(b).

9.     Whereas all defendants must consent to removal under 28 U.S.C. § 1441, a federal officer or agency defendant can unilaterally remove a case under 28 U.S.C. § 1442.  *See Ely Valley Mines, Inc. v. Hartford Accident & Indem. Co.,* 644 F.2d 1310, 1315 (9th Cir. 1981).  Therefore, removal of this case under Federal Officer Removal is timely and appropriate.

### III.

### PURSUANT TO 28 U.S.C. § 1442(A)(1)

### REMOVAL IS PROPER ON FEDERAL OFFICER GROUNDS

10.     As stated above, this case is properly removed under 28 U.S.C. § 1442(a)(1) as this is a civil action commenced in a State court against the United States or an agency thereof or any officer (or any person acting under that officer) of the United States or any agency thereof, sued in an official or individual capacity for any act under color of such office.  Metalclad has a federal defense to this action, *i.e.*, government contractor immunity from liabilities for injuries arising from any exposure to asbestos-containing thermal insulation from a shipment that it brokered that was used by the United States Navy on board Navy vessels.

11.     Metalclad is a "person" within the meaning of 28 U.S.C. § 1442(a)(1). *See Fung v. Apex Corp.*, 816 F.Supp. 569, 572 (N.D. Cal. 1992) (finding that a corporate defendant was a "person").

12.     Removal pursuant to 28 U.S.C. § 1442(a)(1) is appropriate where the moving party can (1) demonstrate that it acted under the direction of a federal officer, (2) raise a colorable federal defense to plaintiff's claims, and (3) demonstrate a causal nexus between plaintiff's claims and acts it performed under color of federal office.  *See Mesa v. California,* 489 U.S. 121 (1989) (setting forth elements of federal officer removal); *Boyle v. United Technologies Corp.,* 487

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

U.S. 500 (1988) (discussing government contractor defense); *Ballenger v. Agco Corp.,* 2007 WL1813821 (N.D. Cal. 2007) (upholding removal where alleged asbestos exposure occurred on Navy ship); *Fung v. Abex Corp.,* 816 F. Supp. 569 (N.D. Cal. 1993) (upholding removal where alleged asbestos exposure occurred in Navy shipyard and submarine); *Ferguson, et al., v. Lorillard Tobacco Co., et al.,* 475 F.Supp.2d 725 (N.D. Ohio 2007) (upholding removal where alleged asbestos exposure occurred aboard Navy ship); *Nesbiet v. General Electric Col, et al.,* 399 F.Supp.2d 205 (S.D.N.Y. 2005) (upholding removal where alleged asbestos exposure occurred in Navy shipyard); *Pack v. AC and S, Inc., et al.,* 838 F.Supp. 1099 (D. Md. 1993) (upholding removal where alleged asbestos exposure occurred in Navy Shipyard).

13.    Metalclad has satisfied all of the three requirements and is entitled to remove the instant action.

14.    The alleged actions attributed to Metalclad, as alleged in Plaintiff's Complaint, were performed by Metalclad under the direction of federal officer, specifically under the direction, control, and supervision of an officer or agency of the United States Navy within the meaning of 28 U.S.C. § 1442(a)(1).  Plaintiff alleges he was an electrician for the U.S. Navy from approximately 1964 to 1968 at Mare Island Naval Shipyard in Vallejo, California. *See* Exh A to Chiu Decl., p. 054. In 1968, Metalclad brokered a shipment of Unibestos thermal insulation from Pittsburgh-Corning's Tyler, Texas, facility to the nuclear division of Mare Island for use in the reactor compartment of the USS *Drum*, the USS *Guitarro*, the USS *Hawkbill*, and the USS *Pintado*. *See* Exh. 1 to Declaration of Dan H. Heflin, Jr. ("Heflin Decl."); Exh. B to Chiu Decl.  The Navy independently solicited this procurement of Unibestos for a specified use aboard these submarines and that procurement was governed by a Navy contract. *See* Heflin Decl., ¶¶ 10-15; Exh. 1 to Heflin Decl.  The award contract set forth specifications that mandated Naval oversight during production, identified where the Unibestos would be used, and, set

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

107104096\V-1

1  forth the testing and verification requirements that were to be met prior to it being

2  used in Naval Service. *Id.*

3       15.    Metalclad has a colorable federal defense to Plaintiff's claims pursuant

4  to the "government contractor defense."  Liability for design defects in military

5  equipment is prohibited under state law where:  (1) the United States reasonably

6  approved precise specifications; (2) the equipment conformed to those

7  specifications; and (3) the supplier warned the United States about the dangers in the

8  use of the equipment that were known to the supplier, but were not known to the

9  United States.  *Boyle v. United Technologies Corp.,* 487 U.S. 500, 512 (1988).

10       16.    The officers of the United States Navy approved reasonably precise

11  specifications of the Metalclad-brokered shipment of Unibestos for use in the

12  reactor compartment of the USS *Drum*, the USS *Guitarro*, the USS *Hawkbill*, and

13  the USS *Pintado*.  In fact, as early as January, 1936, the Navy commissioned a

14  30-day study to determine Unibestos' suitability for use in the Naval Service.  *See*

15  Exh. 8 to Heflin Decl.; Heflin Decl., ¶¶ 12-13.  As a result of that study, the Navy

16  concluded that: (a) Unibestos had satisfactory heat insulating properties; (b) that a

17  desirable property of Unibestos for Naval Service use was its light weight; (c) that it

18  was questionable whether or not Unibestos possessed sufficient stability for use in

19  the Naval Service; and, (d) that a 6-month service study was necessary to determine

20  the stability of Unibestos.  *Id*.  On July 7, 1936, the Navy authorized another study

21  to determine the suitability of Unibestos for use in the Naval Service at high

22  temperatures.  *See* Exh. 9 to Heflin Decl.; Heflin Decl., ¶¶ 12-13.  The results of that

23  study were issued on December 16, 1937, and found that Unibestos' heat insulating

24  properties and light weight were desirable for use in Naval Service.  *Id.*  The

25  December 15, 1936 appearance of Unibestos on restricted Navy specifications

26  indicates the Navy immediately put it into use for Naval Service.  *See* Exhs. C

27  through I to Chiu Decl.  The Navy continued using Unibestos throughout the 1930s,

28  the 1940s, and the 1950s and it remained on the Navy's Qualified Products List

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 6 -

107104096\V-1

1    ("QPL") for the Metalclad-brokered shipment at issue here. *Id.* Pittsburgh Corning

2    did not begin manufacturing Unibestos until July 1, 1962 when it purchased selected

3    assets from Union Asbestos & Rubber Co. – some 26 years after the Navy became

4    involved with Unibestos and at least 26 years after Unibestos appeared on a Navy's

5    QPL. *See* Exhs. J through L to Chiu Decl.

6         17.    The Navy maintains a strict inspection program to assure that vendors

7    comply with all government specifications. *See* Heflin Decl., ¶ 9E-H. To carefully

8    control the products used and to ensure they meet the precise requirements

9    necessary for their intended end use, the Navy maintains separate procurement and

10   requirement departments. *See* Heflin Decl., ¶ 9I. All nuclear products and all

11   non-nuclear products were procured through separate departments and access to

12   nuclear products was prohibited by non-nuclear personnel. *Id.* The Navy also

13   maintained separate specifications for thermal insulation and approved all such

14   thermal insulation produced for the Navy. *See* Heflin Decl., ¶ 9H.

15        18.    Before a manufacturer like Pittsburgh Corning received authorization

16   to manufacture materials such as thermal insulation for use by the Navy, all of the

17   design documentation had to first be inspected by the Navy. *See* Heflin Decl., ¶ 9F.

18   The Navy had superior knowledge of the demands and requirements of combat-

19   ready vessels and this knowledge required Naval control of military specifications.

20   *See* Heflin Decl., ¶ 9G. Military specifications address all aspects of shipboard

21   equipment and materials requirements, including whether the product contained

22   asbestos and reflect the state of the art and the special needs of the Navy's combat

23   vessels. *Id.* Further, the Navy had unique specifications for thermal insulation used

24   aboard nuclear grade submarines and these specifications were communicated to

25   outside vendors, including Pittsburgh Corning, by the Navy in Requests for

26   Proposals for certain equipment and materials. *See* Heflin Decl., ¶ 9H.

27        19.    A QPL pre-qualifies certain vendors to produce certain frequently used

28   Navy-approved products, but a QPL provides a base specification only and does not

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 7 -

107104096\V-1

1   guaranteed a product was suitable for use on every Navy application. *See Heflin*
2   Decl., ¶ 9I-J. To accommodate the Navy's particular combat design interests for
3   specific vessels or classes of vessels, the Navy often requires products appearing on
4   a QPL to meet even stricter performance requirements than those specified by the
5   range of performance parameters allotted for by the QPL alone. *Id.* In that instance,
6   the Navy creates additional, separate specifications to guarantee the product meets
7   the exact performance parameter required at all times throughout the entire life of
8   the vessel. *See Heflin Decl.*, ¶ 9L. The award contract relating to the Metalclad-
9   brokered shipment of Unibestos required compliance with MIL-I-24244; thus, this
10  production had to meet stricter requirements than the Navy's QPL. *See* Exhs. 1 and
11  3 to Heflin Decl.; Exh. I to Chiu Decl.; Heflin Decl., ¶¶ 10-15. In short, stock
12  Pittsburgh Corning Unibestos from the QPL would not have qualified for use on the
13  USS *Drum*, the USS *Guitarro*, the USS *Hawkbill*, and the USS *Pintado* because it
14  would not have met the Navy's corrosion and chemical specifications. *See* Heflin
15  Decl., ¶¶ 10-15; Exhs. 1, 3 and 5 to Heflin Decl.; Exh. I to Chiu Decl.

16      20.    The Metalclad-brokered shipment of Unibestos was qualified for use on
17  the submarines only because it was subject to additional corrosion, mercury,
18  chloride and fluoride analyses in accordance with MIL-I-24244 (Ships), a
19  specification above and beyond what was required by the QPL. *See* Heflin Decl.,
20  ¶¶ 10-15; Exhs. 1, 3 and 5 to Heflin Decl.; Exh. I to Chiu Decl. MIL-I-24244 is a
21  unique military specification entitled Insulation Material With Special Corrosion,
22  Chloride and Fluoride Requirements (ISSE Controlled Further Dissemination Only
23  As Directed By NAVSEA System C-9B2). *See* Exh. 5 to Heflin Decl.; Heflin Decl.,
24  ¶¶ 10-15. MIL-I-24244 is a highly classified document, accessible only by persons
25  in the Naval Sea Systems Command or by the procuring agency, that specifies
26  corrosion, chloride and fluoride requirements above and beyond what is provided
27  for by the QPL. *Id.* General stock Unibestos insulation supplied pursuant to the
28  QPL only, *i.e.*, not subject to the additional specifications of MIL-I-24244, would

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 8 -

NOTICE OF REMOVAL PURSUANT TO
28 U.S.C. §§1441(a) & 1442(a)(1)

not have been appropriate for use given the Navy's express additional requirements invoked for materials intended for use in the nuclear areas of these submarines. *Id*.

21.    As a direct result of the loss of the USS *Thresher* due to the piping failure in its nuclear reactor in 1963, the Navy created "The Submarine Safety Certification Program", known as "SubSafe", a program ensuring that every part of a submarine complied with strict specifications. *See* Exhs. N and O to Chiu Decl.; Exh. 7 to Heflin Decl.; Heflin Decl. ¶ 9D. SubSafe was created to assure that every item affecting the submarine's pressure hull's watertight boundary and/or the ability of the submerged ship to recover from flooding was given significantly upgraded controls. *Id*. The propulsion system is critical to the vessel's recovery capability, and the associated piping is a critical to the propulsion system. *Id*. The insulation applied to that piping must be free of corrosion. *Id*. MIL-I-24244 provides additional requirements assuring freedom from corrosive materials, and is an element of "SubSafe," a key requirement of the specification. *Id*.

22.    In 1939, the Navy promulgated instructions as to what it mandated with regard to heat insulation, which consisted of a compendium of requirements that it had developed over time. *See* Exh. 11 to Heflin Decl.; Heflin Decl., ¶ 14. The Navy department specifications originally specified asbestos by name. In a 1939 Navy department specification relating to pipe covering, the Navy specified asbestos in its molded pipe covering. *See* Exh. 12 to Heflin Decl.; Heflin Decl., ¶ 14. The insulation specifications continuously evolved over time. *See* Heflin Decl., ¶ 14. By approximately 1955, with the advent of MIL-I-2781, the Navy had ceased specifying asbestos by name and had instead make it a performance specification citing criteria that the successful materials would have to exhibit and not specifying the constituent materials by name. *Id*. MIL-I-2781 is a developed specification from many years, which evolved from 1936 wherein Unibestos was specifically tested by the government and its product definition is amosite asbestos with a sodium silicate binder, and MIL-I-24244 is a specification that imposes additional

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

107104096\V-1

1  requirements beyond those of MIL-I-2781 in order to satisfy the unique

2  requirements of insulation to be applied to stressed stainless steel piping.  *Id.*

3       23.    Asbestos-containing thermal insulation was the industry standard of the

4  day for high temperature applications and that remained the case until 1972 when

5  the Navy officially changed the specifications to prohibit the further use of asbestos-

6  containing products where acceptable alternatives had been determined.  *See* Heflin

7  Decl., ¶ 14; Exhs. 2 and 14 to Heflin Decl.  As evidenced from a 1970 Navy Interim

8  Report, the Navy had found no other alternatives that would satisfy MIL-I-2781 or

9  MIL-I-24244 other than asbestos-containing Unibestos insulation.  *See* Exh. 13 to

10 Heflin Decl.; Heflin Decl., ¶ 14.  Although the Navy did not call out asbestos by

11 name in MIL-I-24244, it did invoke MIL-I-2781 as a baseline requirement.  *See*

12 Heflin Decl., ¶ 14.  Since the Navy had itself participated in the development of

13 Unibestos (which it specifically approved via QPLs under the specifications), it

14 knew that the product had to contain asbestos in order to comply with the

15 specification.  *See* Heflin Decl., ¶ 14.  As such, the Metalclad-brokered Unibestos

16 was manufactured in accordance with precise specifications that were supplied by

17 the Navy.

18      24.    The Metalclad-brokered shipment of Unibestos conformed to military

19 specifications.  This shipment of Unibestos was required to and did meet exact

20 corrosion, mercury, chloride and fluoride contamination requirements necessary for

21 use in the submarines' nuclear compartments.  *See* Exhs. 1, 3 and 5 to Heflin Decl.;

22 Exh. I to Chiu Decl.; Heflin Decl., ¶¶ 10-15.  Prior to production, the Navy required

23 Pittsburgh Corning to conduct exacting chemical analyses following explicit Navy

24 protocol.  *See* Exhs. 1, 3 and 5 to Heflin Decl.; Heflin Decl., ¶¶ 10-15.  Prior to

25 shipment, the Navy required Pittsburgh Corning to follow step-by-step Navy testing

26 procedures to determine the corrosion cracking capability of that specific shipment

27 of Unibestos in order to meet specification MIL-I-24244.  *See* Exhs. 1 and 3 to

28 Heflin Decl.; Heflin Decl., ¶¶ 10-15.  The Navy's requirement that Pittsburgh

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 10 -

107104096\V-1

1   Corning certify this particular shipment of Unibestos in accordance with MIL-I-24244 demonstrates that the Navy was directly involved with the production of this shipment of Unibestos. *See* Heflin Decl., ¶¶ 10-15.

4   25.    Additionally, the Navy required Defense Contractor Administration Service ("DCAS") representatives, employed by the Navy, to be present at Pittsburgh Corning's production facility during the specified testing and production. *See* Exh. 1 to Heflin Decl.; Heflin Decl., ¶¶ 9M and 11.  DCAS's role was to ensure that Pittsburgh Corning complied with and met the required government specifications during production.  *See* Heflin Decl., ¶ 9M.  DCAS monitored the testing of the product to ensure that the vendor complied with each and every requirement specified by the Navy's testing procedure.  *Id*.  DCAS also independently reviewed, inspected and tested the product prior to shipment.  DCAS served as the on-site "eyes and the ears" of the government and had the final say as to whether the production complied with the Navy's specification.  *Id*.  DCAS had the final say as to whether the product cleared for shipment.  *Id*.  The Award Contract makes clear that the on-site DCAS at Pittsburgh Corning's facility during this production of Unibestos was required to "witness the [corrosion] test [specified by MIL-I-24244], verify that the procedure [was] followed, and also to personally examine the test specimens . . ."  *See* Exh. 1 to Heflin Decl.; Heflin Decl., ¶ 11.  In addition, the on-site DCAS was required to "verify that [Pittsburgh Corning's] laboratory [was] capable of performing the chemical analysis test" and "to verify that the test results furnished . . . [were] in fact the ones taken from the lot" which Pittsburgh Corning supplied on the contract.  *Id*.

24   26.    Prior to shipping, the Navy required both Pittsburgh Corning and an on-site government inspector to independently certify that this lot of Unibestos met the Navy's exact specifications.  *See* Heflin Decl., ¶ 11; Exhs. 1 and 3 to Heflin Decl.  Moreover, once the shipment arrived at Mare Island, it was subject to further inspection and testing by government personnel. *See* Exh. 1 to Heflin Decl.; Exhs. B

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

107104096\V-1

and P to Chiu Decl.; Heflin Decl., ¶ 11.  It was quarantined at MINS until March, 1969, to guarantee that it met the Navy's combat design requirements for these nuclear grade submarines prior to ever being cleared for use.  *Id.*  As detailed above, the Navy clearly controlled the manufacture and supply of this lot of Unibestos.

27.     The Navy possessed as much as or more information regarding the dangers of asbestos than did Metalclad during the relevant time periods. Specifically, the US Naval Medical Bulletin acknowledged that asbestos was a potential human health hazard in 1922, prescribed methods for dealing with dust, and recognized asbestos dust as causing specific physical symptoms.  *See* Exh. Q to Chiu Decl.  By 1939, the Navy was conducting medical surveys of workers using asbestos-containing materials.  *See* Exh. R to Chiu Decl.  In the early 1940s, the Navy and the United States Maritime Commission jointly sponsored a national conference to address the issues of safety and health requirements in government contract shipyards, resulting in the adoption of the Minimum Requirements for Health and Industrial Safety in Government Contract Shipyards, which specifically addressed the topic of dust suppression to avoid potential asbestos-related illnesses. *See* Exh. S to Chiu Decl.  The Navy further pursued safe work practices during the 1950s and 1960s to reduce the then-known risks associated with exposure to asbestos dust.  *See* Exhs. M, T and U to Chiu Decl.

28.     Even as late as 1970, there were no other substitutes for thermal insulation required under MIL-I-24244 (*i.e.*, Unibestos), and the Navy maintained sole discretion for the materials it qualified.  As noted in a Navy 1970 Interim Report on the feasibility of eliminating asbestos from use at shipyards, "The insulation materials used on stainless steel piping must meet the requirements of MIL-I-24244 regarding chloride content.  None of the recommended materials [in this study] are qualified to meet this specification..."  See Exh. 13 to Heflin Decl.

29.     Nonetheless, Pittsburgh Corning had already begun affixing warnings to Unibestos, prior to this December 1968 shipment.  *See* Exhs. J through L to Chiu

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 12 -

107104096\V-1

Decl.  As of November 1968, Pittsburgh Corning began affixing a 5-inch by 3-inch notice to be printed in red on all cartons containing Unibestos.  *Id.*  Those warnings, which again were implemented before this shipment of Unibestos, read:  "This product contains asbestos fibers.  If dust is created when this product is handled, avoid breathing the dust.  If adequate ventilation control is not possible, wear respirator approved by the U.S. Bureau of Mines."  *Id.*  Further, Navy specifications addressed all communication placed on all materials supplied by outside contractors and the Navy utilized its own warning and training protocols regarding the use of asbestos.  *See* Heflin Decl., ¶ 9N.  Therefore, it is highly unlikely that the Navy would have allowed either Metalclad or Pittsburgh Corning to include additional warnings on this shipment regarding the potential risks of asbestos.  *Id.*  Because the Navy was aware of the potential health hazards of asbestos, and Pittsburgh Corning provided warnings on Unibestos, Metalclad had no duty to warn the Navy.  *See Boyle* at 512; *Ramey v. Martin-Barker Aircraft,* 874 F.2d 946, 951 at n.10 (4th Cir. 1989) ["Because we conclude the Navy was already aware of the risk at issue, we need not consider whether [the manufacturer] would otherwise have been required to warn the Navy directly of the risk in order to assert successfully a military contractor defense."]; *Shuman v. United States,* 765 F.2d 283, 285-286 (1st Cir. 1989); *Sundstrom v. McDonnell Douglas Corp.,* 816 F.Supp. 587, 589-590, 595-596 (N.D. Cal. 1993).

30.    Based upon the submitted evidence, Metalclad has demonstrated a causal nexus between Plaintiff's claims and acts it performed under color of federal office.

31.    The U.S. Supreme Court and the Ninth Circuit have instructed courts to interpret 28 U.S.C. § 1442(a)(1) broadly in favor of removal.  See *Arizona v. Manypenny*, 451 U.S. 232 (1981) (policy favoring removal should not be frustrated by narrow, grudging interpretations of § 1442(a)(1)); *Durham v. Lockheed Martin Corp.,* 445 F.3d 1247, 1252 (9th Cir. 2006) (noting that, because it is important to

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

107104096\V-1

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1  the federal government to protect federal officers, removal rights under section 1442

2  are much broader than those under 1441); *Ballenger v. Agco Corp.,* 2007

3  WL1813821 (N.D. Cal. 2007) (The Ninth Circuit instructs that there is a 'clear

4  command from both Congress and the Supreme Court that when federal officers and

5  their agents are seeking a federal forum, we are to interpret section 1442 broadly in

6  favor of removal.').

7      32.    The existence of a single removable claim allows removal of the entire

8  action.  28 U.S.C. § 1441(c); *see also National Audubon Society v. Dept. of Water*,

9  496 F.Supp. 499, 509 (E.D. Cal. 1980).

10     33.    Notice of removal has been filed with the state court and provided to all

11  adverse parties pursuant to 28 U.S.C. § 1446(d).

12     34.    This removal is based upon this Notice of Removal to the United States

13  District Court, the Certificate of Service of Notice to Adverse Party of Removal, the

14  Notice to Adverse Party of Removal filed in the state court action, the Declarations

15  of Sylvia Chiu and Dan H. Heflin, Jr. and attached exhibits, all process, pleadings,

16  and orders that have been served upon Metalclad in the state court case, and any

17  other matters that the Court deems applicable.

**IV.**

**GROUNDS FOR REMOVAL:  "FEDERAL ENCLAVE" JURISDICTION**

20     35.    In this case, Plaintiff alleges he was exposed to asbestos-containing

21  product while working at the Long Beach Naval Shipyard, a "federal enclave."  As a

22  result, "federal enclave" jurisdiction exists in this Court over the claims asserted in

23  Plaintiff's Complaint, and Defendant may properly remove this case from state

24  court.  *See* 28 U.S.C. § 1331; U.S. Const. art I, § 8, cl. 17; *Willis v. Craig*, 555 F.2d

25  724, 725 (9th Cir. 1977).

26     36.    The United States has power and exclusive authority "in all Cases

27  whatsoever . . . over all places purchased" by the government "for the erection of

28  Forts, Magazines, Arsenals, Dock-Yards, and other needful Buildings."  U.S. Const.

107104096\V-1

art. I, § 8, cl. 17.  Such places are "federal enclaves" within which the United States – and its system of federal courts – has *exclusive jurisdiction* over lawsuits involving injuries occurring thereon.  *Akin v. Ashland Chemical Co.*, 156 F.3d 1030, 1034 (10th Cir. 1998).  The Constitution's provision that Congress shall have power "[t]o exercise exclusive Legislation," has been construed to mean exclusive jurisdiction under 28 U.S.C. section 1331.  *Akin*, *supra*, at 1034; *Mater v. Holley*, 200 F.2d 123, 124-125 (5th Cir. 1952).  Noting that the United States has exclusive sovereignty in enclave areas, the Fifth Circuit said that it "would be incongruous to hold that (courts of the United States) are without power to adjudicate controversies arising" therein.  *Akin*, *supra*, at 1034.

37.   Long Beach Naval Shipyard was a federal shipyard and enclave.  In 1940, the United States acquired the land where the Department of Navy constructed the Long Beach Naval Shipyard.  *See* ¶ 7.R.1 of Quitclaim Deed recorded on December 5, 2001, by the United States of America to the City of Long Beach, attached as Exh. A to Request for Judicial Notice.

38.   From 1941 to 1944, the U.S. Navy constructed Dry Dock No. 1 at the Long Beach Naval Shipyard to accommodate the largest ships of the Navy then in service.  *Connolly-Pacific Co. v. United States*, 175 Ct.Cl. 134, 143, 358 F.2d 995 (1966).

39.   The Long Beach Naval Shipyard was closed in 1994 and in 1997.  *See* ¶ 7.R.1 of Quitclaim Deed attached as Exh. A to Request for Judicial Notice.

40.   In 2001, the United States conveyed approximately 282 acres of land to the City of Long Beach, California and its Board of Harbor Commissioners.  ¶ 2 of Quitclaim Deed attached as Exh. A to Request for Judicial Notice.

41.   From 1940 to 1997, the Long Beach Naval Shipyard was a "federal enclave" as a matter of law.  *Torrens v. Lockheed Martin Servs. Group, Inc.*, 396 F.3d 468, 473 (5th Cir. 2005) (the United States certainly took the land when the Navy occupied it and built its permanent facilities upon it).  Abundant case law

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

NOTICE OF REMOVAL PURSUANT TO
28 U.S.C. §§1441(a) & 1442(a)(1)

107104096\V-1

1  establishes Long Beach Naval Shipyard as a federal enclave.  In *Corley v. Long-*
2  *Lewis*, 688 F.Supp.2d 1315 (C.D. Ala. 2010), an asbestos case, defendants removed
3  based on federal enclave jurisdiction.  The case involved the Philadelphia Naval
4  Shipyard, Long Beach Naval Shipyard, and Norfolk Shipyard.  The court held that
5  "despite plaintiffs' claims to the contrary, there is ample evidence that these
6  facilities are federal enclaves."  *Id.* at 1323.

7       42.    From 1940 to 1997, the Long Beach Naval Shipyard was also a
8  "federal enclave" inclusive of any ships berthed or in dry-dock.  Federal enclaves
9  extend to places beyond land or a structure on land; the permanence of the fixture on
10  land is not decisive.  The waters or seabed within the bounds of the shipyard are part
11  of the enclave, and so vessels docked within the shipyard are within a "federal
12  enclave."  In *Akin v. Big Three Industries, Inc.*, 851 F.Supp. 819 (E.D. Tex.
13  1994), the court repeatedly emphasized "all plaintiffs performed all duties on
14  Tinker Air Force Base, and all claimed chemical exposure *while* plaintiffs
15  performed these duties . . . the location of the claimed exposures, . . *is the*
16  *singularly relevant fact when determining the applicability of enclave*
17  *jurisdiction.*"  *Id.* at 825 (emphasis added).  In the analogous case of *EEX Corp.*
18  *v. ABB Vetco Gray, Inc.*, 161 F.Supp.2d 747 (S.D. Tex. 2001), the court ruled
19  that a vessel ceases to be a vessel the moment it attaches itself to the Outer
20  Continental Shelf Lands; at that point, the court ruled, the vessel has become a
21  "tiny federal enclave."  *Id.* at 749.  The court reasoned:

22         "If lightning strikes a Morocco-bound cargo ship sailing
23         over the shelf, or if a survey ship smashes against a rock
24         jutting out from the shelf, the act does not apply because
25         the ships were merely traveling over the shelf, not
26         conducting activities on it.  Here, EEX's injuries arose
27         because of its barge's operations on the shelf."
28  *Id.* at 749.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 16 -

107104096\V-1

# V.

## CONSENT OF DEFENDANTS

43.     The right to remove a case from state to federal court belongs exclusively to "the defendant or the defendants. . ."  28 U.S.C. § 1441(a).  In a case with more than one defendant, as here, the right to remove belongs to the defendants jointly.  *Hewitt v. City of Stanton,* 798 F.2d 1230, 1232 (9th Cir. 1986).  Thus, as a prerequisite to removal, the federal courts have acknowledged the "rule of unanimity" – that is, the removing defendant must confirm that *all* remaining defendants served with the state court action have consented to the removal of the case to federal court, and provide an explanation if otherwise.  *Prize Prize, Inc. v. Matrix (U.S.) Inc.,* 167 F.3d 1261, 1266 (9th Cir. 1999); *see also* Tashima & Wagstaffe, Practice Guide: Fed. Civ. Pro. Before Trial, (The Rutter Guide 2015), at 2:3448. Any defendants that have not yet been served with the state court pleadings at the time of removal are not required to submit their consent; a defendant who has been served or who has otherwise acquired notice of a state court action need not seek out and notify codefendants who have not yet been served to ask them to join in the removal.  *Gossmeyer v. McDonald,* 128 F.3d 481, 489 (7th Cir. 1997).

44.     In *Proctor v. Vishay Intertechnology, Inc.,* the 9th Circuit set forth the procedural requirement for establishing that all parties consented to jurisdiction. *Proctor v. Vishay Intertech., Inc.,* 584 F.3d 1208 (9th Cir. 2009).  In that case, the 9th Circuit held that

> "a notice of removal can be effective without individual consent documents on behalf of each defendant.  *One defendant's timely removal notice containing an averment of the other defendants' consent and signed by an attorney of record is sufficient.*"

*Id.* at 1225.  The Court of Appeal reasoned:

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

107104096\V-1

1  "[Defendant] submitted such an averment under threat of

2  sanctions pursuant to Rule 11; the other co-defendants were

3  notified of the removal notice and had an opportunity to

4  object to it.  These two considerations – the availability of

5  sanctions and of objection – mitigate concerns that one

6  defendant might falsely state the other defendants' consent, or

7  that one defendant might game the system by silently

8  allowing another to remove and, if the federal forum proves

9  disadvantageous, belatedly object that he had not consented."

10  *Id.*

11    45.    The unanimity rule may be disregarded where:  (1) a non-joining

12  defendant is an unknown or nominal party; or (2) where a defendant has been

13  fraudulently joined.  *Balazik v. County of Dauphin*, 44 F.3d 209, 213 (3d Cir. 1995);

14  *McManus v. Glassman's Wynnefield, Inc.*, 710 F.Supp. 1043, 1045, n. 5 (E.D. Pa.

15  1989) (citing *Fellhauer v. City of Geneva*, 673 F.Supp. 1445, 1447 n. 4 (N.D. Ill.

16  1987).

17    46.    The "nominal party exception" to consent to removal ensures that only

18  those parties with a palpable interest in the outcome of a case, and not those without

19  any real stake, determine whether a Federal Court can hear a case; this exception

20  helps to prevent a party from overriding congressionally prescribed bases for

21  removal through strategic pleading.  28 U.S.C.A. § 1441(a); *Hartford Fire Ins. Co.*

22  *v. Harleysville Mut. Ins. Co.*, 736 F.3d 255, 259 (4th Cir. 2013).

23    47.    Here, all remaining defendants served with the Complaint at the time of

24  filing this Notice of Removal consented to the instant removal.  (Chiu Decl., ¶ 24.)

25  Durez Corporation, Rockwell Automation, Inc., and Foster Wheeler Energy

26  Corporation have resolved the case with Plaintiff, thus they are not remaining

27  defendants.  (Chiu Decl., ¶ 24.)

28

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 18 -

NOTICE OF REMOVAL PURSUANT TO
28 U.S.C. §§1441(a) & 1442(a)(1)

107104096\V-1

48.     By giving consent to remove, the remaining defendants do not waive their right to assert all applicable defenses including challenges to personal jurisdiction in both California State and Federal Courts.

WHEREFORE, Defendant Metalclad Insulation LLC hereby removes this action to the United States District Court for the Central District of California, and seeks that the Superior Court of the State of California, County of Los Angeles, proceed no further with respect to this action.

Dated:  April 13, 2018                     Respectfully submitted,

DENTONS US LLP
Bradford J. DeJardin
Sylvia Chiu

By: _____
      Sylvia Chiu

Attorneys for Defendant
**METALCLAD INSULATION LLC**

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 19 -

107104096\V-1